IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIAN BOYAJIAN            :      CIVIL ACTION
                          :
          v.              :
                          :
UNITED STATES OF AMERICA  :      NO. 10-1064


MEMORANDUM


McLaughlin, J.                          October 14, 2011


        Brian Boyajian was injured when the bicycle he was
riding was hit by a car being driven by an FBI agent.  He has
brought a claim under the Federal Tort Claims Act.  The Court
held a bench trial on July 26 and 27, 2011.  The Court finds for
the plaintiff in the total amount of $72,700.16.


I.   Findings of Fact

        1.   The plaintiff, Brian Boyajian, is twenty-five
years old and lives in New Orleans, Louisiana, with Erin
Fitzgerald.  In February, 2009, he was living in Philadelphia
with Fitzgerald.

        2.   At some time before noon on February 9, 2009,
Boyajian rode his bike from his house in West Philadelphia to
downtown Philadelphia.  He rode to a friend's house at 9th &
Catherine Streets but his friend was not home.  It was a sunny,
chilly day.

3.   The bicycle he was riding was unconventional,
consisting of two frames welded together, one on top of the
other, with the seat about 5 feet above the ground.  There is a
front braking system on the bicycle.  You make the brakes work by
way of a lever on the handle bar.  The pads hit the rim when you
pull the lever.  The bike brakes like a regular mountain bike.
The brakes were functioning on this day.

4.   At approximately noon, he was riding his bike west
on Catherine Street, in South Philadelphia.  Boyajian was wearing
jeans and a sweat shirt.  He had a bicycle messenger bag on his
back.  He did not have on a helmet.

5.   At the same time, Special Agent Earl D. Martin of
the Federal Bureau of Investigation was driving south on 12th
Street, approaching Catherine Street.

6.   As Boyajian approached the stop sign on 12th
Street at Catherine Street, he saw Special Agent Martin's car
coming south on 12th Street and he could see that it was slowing
down.  He saw the driver with his left hand up protecting his
eyes from sun glare.  Boyajian stopped at the stop sign, just
past the stop line.  He was closer to the center of the lane when
he stopped.  At that time, Special Agent Martin's car was about
two car lengths back on 12th Street.

7.   Boyajian proceeded through the intersection.  When
he was most of the way through the intersection, he saw that the

car was not slowing down or stopping.  The car hit the rear of
the bicycle frame on the right side.  The car did not strike his
body, just the bicycle.  His body was thrown toward the southwest
corner of the intersection.  He came down on his hands and feet.
His body cleared the bicycle.

      8.   Special Agent Martin has been with the FBI for
twelve years and is presently assigned to the Milwaukee field
office.  The agent was involved in a surveillance operation at
the time of the accident.  He did not stop because he did not see
the stop sign.  He raised his left hand over his eye to protect
himself from the glare of the sun.  The stop sign was on his left
and he did not see it.  He saw Boyajian a split second before his
car hit the bike.  At that point, Special Agent Martin did not
have time to stop.  He was going 20 to 25 miles per hour at the
time of the impact.

      9.   Special Agent Martin assisted Boyajian.  Someone
else called an ambulance.  They helped Boyajian get to the corner
of the intersection and Boyajian locked the bike to a sign.
Boyajian asked Special Agent Martin whether he saw the stop sign
and Special Agent Martin told him that he did not because the sun
was in his eyes.

      10.  Boyajian had ridden this bicycle and others like
it for many years.  He rode this particular bicycle very often --
every day for periods of time.  He used it periodically as his

regular mode of transportation.  He had never experienced difficulty riding the bike.

11.   There are two ways to stop the bike at a traffic light.  Boyajian could either hop down from the bike after coming to a stop or lean on a post or sign.  He would use his body weight and steer the front of the bike to offset the balance, similar to how one rides a unicycle.  He could balance the bike in this way for more than a minute if he concentrated.

12.   At the time of the accident, Boyajian was working at a restaurant in West Philadelphia.  He had been working there for about two and a half months at the time of the accident. Before the accident, he had no difficulty working in the restaurant.  He never had any difficulty with his left wrist. When he was about fourteen years old, Boyajian had a minor fracture in his left wrist and had a cast on it for about four weeks.  The wrist never bothered him after that.  He had a minor fracture on his right wrist when he was eight or nine years old and that fracture healed without a problem.

13.   Before the accident, Boyajian worked on and rode bicycles a lot.  He volunteered for a co-op called "Neighborhood Bike Works" where people can work on their bikes for free with the help of volunteers like himself.  Before the accident, he and Fitzgerald shared cooking, cleaning, housework, laundry, etc.

Cooking is a passion for both of them.  Boyajian never attended any cooking schools or took any courses on cooking.

14.   The bicycle was heavy gauge steel.  It was not repairable after the accident.  The parties agree that the cost of the bicycle is $500.00

15.   While Boyajian was on the ground after the accident, his wrist hurt a lot and both feet were painful.  He had some scrapes on his body and palms and a protrusion on his left wrist.  The fact that the plaintiff fell from the five feet high seat on the bike contributed to his injuries.

16.   The plaintiff fractured his left wrist as a result of the accident.  The plaintiff is right handed.  The plaintiff also injured his large left toe.  No doctor has prescribed any treatment for the plaintiff's left foot.  The plaintiff has had some minor balance issues arising from the injury to his foot.

17.   At the present time, there is some prominence or protrusion of the ulnar styloid area on the plaintiff's left wrist.  Contributing to this prominence were both the childhood injury he suffered as well as the accident of February 9, 2009.

18.   Following the accident, the plaintiff took prescription pain medication for several weeks.  Since that time, he has used over-the-counter medication such as ibuprofen on an as needed basis.  He wore a brace on his right hand for about a

week after the accident and a cast on his left hand for five
weeks.

19.  He did not work for the first nine weeks after the
accident and that includes volunteer work.

20.  After the accident, he went to Jefferson Hospital
where they put his left wrist in a cast and put his arm in a
sling.  He could not do much for the next several weeks.  He
could not walk because his feet hurt and he could not use his
wrists, especially the left one.

21.  He went to the Philadelphia Hand Center a few days
after his emergency room visit.  They took more x-rays and gave
him another cast.  That was the first time he saw Dr. Taras.
Boyajian was given an appointment for a week later.  His wrist
was feeling worse so he went back to the Hand Center early before
his next appointment.  Dr. Taras spoke with him about surgical
options.  Boyajian asked Dr. Taras if he could think about the
surgical options for a few more days.

22.  Boyajian testified that he made the decision not
to have surgery because he did not have any health insurance.

23.  There is no dispute that the medical bills are
$7277.95.  The agreed wage loss is $3000.00.

24.  Boyajian decided to contact an attorney and find a
way to talk to a medical professional because he did not have
medical insurance and could not afford to go to a doctor.  His

lawyer put him in contact with Dr. Jaeger, and fronted the money
to Dr. Jaeger.  His first visit with Dr. Jaeger was in May of
2009.  Dr. Jaeger performed some basic tests for grip strength
and sent him to get x-rays and an MRI.  He did not give the
plaintiff any therapy.

        25.  Five radiological reports were introduced into
evidence:

      Government's Exhibit 13 is a report of an x-ray of the
left wrist taken on February 9, 2009.  The findings of the
radiologist is that there was a "comminuted intra-articular
fracture of the distal radius."

      Government's Exhibit 14 is a report of an MRI of the wrist
taken on May 5, 2009.  The findings of the radiologist were a
"healed, nondisplaced fracture," "no step-off deformity," and
"carpal arc alignment is maintained."

      Government's Exhibit 15 is an x-ray from May 5, 2009.  It
also shows "healing left intra-articular comminuted distal radial
fracture," and "preserved and aligned carpal arcs."

      Government's Exhibit 16 is a May 5, 2009, x-ray of the foot.
It showed "no fracture or soft tissue swelling," and "no
significant bony abnormality of bilateral feet."

      Government's Exhibit 17 is an x-ray of the left wrist
performed on May 2, 2011.  It states: "previously identified

distal left radius fracture has healed;" "no significant
degenerative arthropathy."

　　　　26.　A major dispute between the parties is whether the
plaintiff has established future medical expenses and continuing
injuries.　The main question is whether the plaintiff needs an
operation on his left wrist.　And if so, what kind of operation.
In his expert report, Dr. Scott Jaeger, the plaintiff's expert,
opined that the plaintiff should undergo an open reduction and
reconstruction of the distal radioulnar joint.　The cost of this
operation was $17,500.　See Government Exhibit 4.　On May 2,
2011, Dr. Jaeger issued a report that stated that "if [plaintiff's
condition] progresses to a greater extent, he may very well be
required to consider a fusion arthrodesis of the wrist to prevent
a further collapse of the articular structures."　Government
Exhibit 9.　No new supporting clinical data was presented for
this conclusion.　During his trial testimony, Dr. Jaeger opined
that it was too late for open reduction and a reconstruction
operation. and that the plaintiff would need at some point in the
future fusion surgery to fuse the wrist.　Dr. Jaeger testified
that the cost was "probably about double the repair."

　　　　27.　The Government's expert, Dr. Richard J. Mandel,
testified by way of videotape that when he looked at the x-rays
that were taken in the emergency room shortly after the accident,
he saw evidence of an old injury to the ulnar styloid, the small

forearm bone that was consistent with the childhood injury that the plaintiff reported.  There was also evidence of a new fracture of the distal radius, which is the large forearm bone. Dr. Mandel testified that the new fracture would have contributed to a small extent to the prominence of the ulnar styloid, but the main prominence was related to the old childhood injury.

28.  Dr. Mandel opined that he does not anticipate that the plaintiff will develop arthritis in the wrist.  It has not occurred thus far and he does not expect it.  He thinks that the plaintiff will improve.  The injury was in February 2009.  Dr. Mandel saw him a year and a half later.  New x-rays showed that no arthritis had developed.  If posttraumatic arthritis is going to develop in the wrist, it develops within this time frame.  He testified that the plaintiff was not a candidate for surgery.

29.  The Court did not find Dr. Jaeger persuasive on the question of whether the plaintiff needs an operation or will need an operation in the future.  His testimony was inconsistent with the radiological reports.  Dr. Jaeger did not support his opinion with any clinical data.  Dr. Mandel's testimony about the need for an operation was consistent with the radiological reports and more convincing.

30.  Several months before the accident, Boyajian and Fitzgerald had planned a trip to New Orleans.  They had planned to leave Philadelphia in August, and followed through on that

plan.  They rode to New Orleans on a standard bicycle.  Boyajian modified the frame so that he was sitting more upright so that he did not have any weight on his wrists.  He shifted everything toward the back of the bicycle and the lower part of his body. They had a tent and a sleeping bag with a handful of tools and a bit of clothing with them for the trip.  The bags were attached to the bicycle like saddle bags on a horse.  The tent was on the top of the rack that the bags were attached to.  It took them over a month to go to New Orleans.

31.  It was a leisurely trip.  They encountered some hills but avoided certain spots.  For example, they did not ride up the Blue Ridge Parkway.

32.  After a week or two in New Orleans, they decided to move there permanently.  Boyajian got a job in a restaurant within a week of moving to New Orleans.  The first restaurant at which he worked was a tourist restaurant in the French Quarter. He then worked at a steak house owned by the Brennan family. After that, he got a job at Satsuma which he held for about a year.  He did saute and grill work, made sandwiches and prepared breakfast and lunch.  He worked in the mornings from 7 or 8 a.m. until 3 or 4 p.m. in the afternoon.  He left that job because his wrist injury was becoming more painful and it was stressful working with the pain in his wrist.

33.   In his work as a chef, he used his hands and wrists a lot.   His left wrist was sore some of the time when he was working and after work.

34.   Boyajian did not have the same range of motion with his wrist so he could not do the things he used to as far as flipping food in pans, etc.   He did not have any specific plans about cooking in the future at this time.   He thought that he probably would open his own restaurant.   He does not have those plans any longer.

35.   Currently, Boyajian works in New Orleans in a bicycle shop diagnosing problems with bikes and doing some mechanical work and sales.   He has been working at the bicycle shop since September 2010.

36.   He has done alterations to every bike that he rides.   He bikes at least two miles a day, maybe more.   The longest ride he has taken within the last month is fifteen miles that takes between one and two hours.

37.   The plaintiff has seen no doctors in New Orleans.

II.   Conclusions of Law

The plaintiff has brought his lawsuit under the Federal Tort Claims Act, 82 U.S.C. § 2671 et seq.   The Federal Tort Claims Act provides that, "the United States shall be liable . . . in the same manner and to the same extent as a private

individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  The Court has jurisdiction pursuant to 28 U.S.C. § 1346(b)(1).  The liability of the United States and the amount of damages and the manner in which they can be collected is governed by the law of Pennsylvania, where the accident occurred.

The plaintiff must establish a causal connection between the defendant's allegedly negligent conduct and the plaintiff's injury.  Trude v. Martin, 660 A.2d 626, 632 (Pa. Super. 1995), citing Restatement (Second) of Torts, § 431(a). The defendant's conduct must be shown to have been the proximate cause of the plaintiff's injury.  The plaintiff must show that the defendant's negligent act or omission was a substantial factor in bringing about the plaintiff's injury.  Id.  Under the Federal Tort Claims Act, the plaintiff is not entitled to a trial by jury; the case is tried by the court without a jury. 28 U.S.C. § 2402.

The United States does not dispute that Special Agent Martin was negligent in not stopping at the stop sign.  Indeed, Pennsylvania Motor Vehicle Code 75 § 3323(b) provides that: "Every driver of a vehicle approaching a stop sign shall stop at a clearly marked stop line . . .."  There is no dispute that there is clearly marked stop line at the corner of 12th &

Catherine Streets at which Special Agent Martin should have stopped.

Pennsylvania has adopted the comparative negligence statute which provides at 42 Pa. Cons. Stat. Ann. § 7102:

> In all actions brought to recover damages for negligence resulting in death or injury to persons or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

The Court finds that the plaintiff was contributorily negligent and, therefore, the Court will decrease the damages suffered by the plaintiff by ten percent, the amount of negligence the Court attributes to the plaintiff.

The defendant has argued that the plaintiff was contributorily negligent in a variety of ways: by failing to stop at the stop sign; by riding such an unconventional bicycle that carried with it such an inherent risk of injury; and, by not stopping at the stop sign long enough to make sure that Special Agent Martin was going to stop. The Court has found as a fact that the plaintiff did stop at the stop sign so that is not a basis for contributory negligence. The Court also does not believe that it has a basis to find that riding this bicycle is

inherently negligent.  Although unconventional, the plaintiff had ridden this bicycle and bicycles similar to it for a long time prior to the accident without incident.  He was an experienced bike rider.

The Court does find, however, that the unconventional nature of the bicycle does underlie its conclusion that the plaintiff should have stopped at the stop sign longer to make sure that Special Agent Martin was going to stop.  Boyajian saw Special Agent Martin's car coming and he saw that the sun glare was in Special Agent Martin's eyes.  Boyajian also knew that he was on a bicycle that had such a high seat that he could be more seriously injured if he were ever hit by a car.  Under all of these circumstances, the Court finds that Boyajian should have stopped at the stop sign until he saw Special Agent Martin stop.

In view of the clear negligence of Special Agent Martin in not stopping at the stop sign, the Court finds that the plaintiff's contribution to his own injuries was ten percent.

The plaintiff is entitled to be compensated for the amount of earnings that he lost up to the time of the trial as a result of his injuries.  This amount is the difference between what he could have earned but for the harm suffered in the accident.  Since the plaintiff was out of work from February 10, 2009, through April 20, 2009, and was earning between $250 and

$300 a week, he is entitled to recover a total loss of income of $3,000.

The plaintiff is entitled to be compensated for the harm done to his bicycle.  Since his property was a total loss and damages are to be measured by either its market value or its special value to the plaintiff, whichever is greater, the plaintiff is entitled to be compensated in the amount of $500.

The plaintiff is entitled to be compensated in the amount of all medical expenses incurred for the diagnosis, treatment and cure of his injuries in the past.  These expenses are $7,277.95.

The Court concludes that the plaintiff has not shown by a preponderance of the evidence that the plaintiff will need fusion surgery in the future or that the cost will be $35,000. First, Dr. Jaeger first mentioned the surgery in his report issued shortly before trial on May 2, 2011.  His opinion at that time was very tentative.  Second, Dr. Jaeger did not support the new opinion with any clinical data.  He had not seen the plaintiff for many months before May.  Third, and very importantly, no radiological report supports Dr. Jaeger's opinion.  The May 2, 2011, radiological report finds that there is "[n]o significant degenerative arthropathy."  Fourth, the defendant's expert, Dr. Mandel, persuasively testified that he does not anticipate that the plaintiff will develop arthritis in

the wrist.  According to Dr. Mandel, if posttraumatic arthritis
is going to develop in the wrist, it would have developed
already.  He opined that the plaintiff is not a candidate for
surgery.

The plaintiff has made a claim for a damage award for
past and future noneconomic loss.  There are four items that make
up a damage award for noneconomic loss, both past and future: (1)
pain and suffering; (2) embarrassment and humiliation; (3) loss
of ability to enjoy the pleasures of life; and (4) disfigurement.

The Court is convinced by the plaintiff's testimony
that he is continuing to feel pain and stiffness in his wrist and
that condition contributed to his leaving his last job as a chef.
He also has to modify bicycles to accommodate his weakened wrist.
The pleasures of life have been impacted by his injury.  There
has been some disfigurement in that at least some of the
prominence of the ulnar styloid area of the plaintiff's left
wrist is from the accident.  The Court, therefore, concludes that
the plaintiff is entitled to a damage award for past and future
noneconomic loss in the amount of $70,000.  The total amount of
damages is $80,777.95.  Ten percent of that amount is $8,077.79.
The total damage award is, therefore, $72,700.16.

An appropriate order follows separately.